Okay. Good morning, everybody. Welcome to the United States Court of Appeals for the Fourth Circuit. I was trying to see if our vaunted and trusty clerk could somehow change this from a bat cave to a little bit more lighting, but we'll work on that in the interim, I guess we'll make do. We have three cases on for hearing this morning. The first is 23-1880, M.P. v. Meta Platforms. Mr. Mandich. Yes, please. Thank you, Your Honor. And may it please the court, my name is Mark Mandich, and I represent the appellant in this case, M.P. Apologize in advance, I'm getting over a cold here, but I'll try to. That's my battle. So there are a number of issues in this case. I'd like to start with 230, and I think that's where my focus will lie, unless the court cares to hear other ways. But we'll get to whatever we can. So beginning with Section 230. It was Meta, not third parties, who designed a product to hack and exploit a weakness in the human brain in order to mine attention. It was Meta's decision to do so without any safeguards or concerns for the myriad ways this can be harmful to consumers, ways we've seen in recent years, including the youth mental health epidemic that's ongoing, radicalization and polarization, which is something we'll hear about today, and facilitating trafficking, child sex trafficking, and terrorism. It was Meta that created recommendation algorithms concerning content, friends, and groups. It was Meta who decided to design these algorithms in such a way that they inherently promoted negative emotion-inducing content, and content that was polarizing, violent, shocking, upsetting, whatever terms you may choose. It was Meta that decided to design these algorithms to induce chemical changes in the brain. It was Meta who ignored the calls of its own insiders and employees to fix its algorithm or moderate its policies, because its product, as designed and placed in the market, was inherently dangerous, in particular in its tendency to drive negative emotional responses and to elicit what its own insiders have termed emotional contagion. These are our allegations against Meta. Well, let me ask you about those, because those are, they might well be very compelling allegations in terms of broad critiques of these platforms, many of which I think deserve the criticism, but, you know, we're focused on this case and how these platforms, if at all, were a cause of the horrific crimes that Mr. Roof committed in Charleston, South Carolina, and I think that's where the concern I have is that the link that you were attempting to make in the complaint just doesn't seem to be there, so maybe you can focus on that, in addition to the fact that you've got to overcome the congressional policy with respect to 230 and limitations on suit that certainly it appears that Congress intended to eliminate on facts similar to the ones you've alleged. Certainly, Your Honor, so I'll start with the facts side of that and then circle back to the law. So, admittedly, our claims and facts regarding Dylann Roof and his Facebook interaction rely a lot on inference. And here's how we get there, okay? We know that Dylann Roof had a Facebook page. We know that he curated in terms of his number of friends, such as to demonstrate his allegiance to white supremacist ideology, and that he felt comfortable enough to post pictures of himself in white supremacist symbolism, a Rhodesian flag and things of that nature. His infamous, now infamous, Google search was three years prior to the attack on the church in Charleston. We know that Google and Facebook share data. We know that Facebook would have been aware that this type of content was something he was interested in and would keep him engaged and would be a powerful driver of his engagement. Do we know that, or are you just speculating about that? Well, we know the way Facebook's algorithm worked. And if he, well... Well, we know that maybe as a general matter, but I guess the problem is linking whatever Google and or Facebook were doing to the acts that were committed in this case. And then on top of that, and I apologize for digressing from your primary argument, which is the 230 issue, even if all of that is true, how do you get around the fact that we have precedent that makes it, at least from my perspective, pretty clear that on these facts, there just isn't any basis for liability because Congress has told us so? Well, so going to that legal point, which I guess is where you want me to go now, the recent decision by the Supreme Court, Moody v. Net Choice, followed up by the Third Circuit's decision in Anderson v. TikTok has shifted the ground here. We now know that the recommendation algorithms that are used by companies like Facebook are their own conduct, their own content, their own speech. Anderson v. TikTok from the Third Circuit picked up on that and has now found that 230 is no bar to claims that are based on that conduct, Meta's conduct, or other social media platforms or any Internet service provider that, over which you can make a claim that their recommendation algorithms played a role in the harm that occurred. And that is... Can I ask you about, you just said recommendation algorithms. Can I, would you be willing to maybe specify what algorithms are challenging? Now, I don't, you don't know Facebook's internal materials. I'm not asking for that, but, for example, in Force v. Facebook, the majority in the dissent seemed to be drawing some fine lines based on newsfeed, where certain third-party user content was placed, as the majority saw it, versus recommendations. Judge Katzmann thought it was important that, in some respects, the algorithms went beyond just placing third-party content in certain spots for certain users, but they affirmatively recommended that a user join a certain group or befriend another person. And I'm looking at your complaint and trying to parse that and make sure that I know all the different algorithms, maybe not be the right term, but all the different results that you are challenging. So, friends, groups, content, the newsfeed, the groups you should join, the people you may know, we believe there's a reasonable inference that when Dylann Roof would have gone on to Facebook, based on how its algorithm works, based on the fact that he had been performing searches about black-on-white crime and spending time on the Council of Conservative Citizens' website, that the Facebook group that Facebook actually self-generated for the Council of Conservative Citizens likely would have popped up. That, otherwise, his feed would have contained content that was polarizing in terms of the issue that he had searched on Google, black-on-white crime. The ins and outs, exactly how those dots connect in our case, no one knows that other than Facebook. So, we're a little hampered there, and I'll admit that. I knew walking in that that would probably be top of Your Honor's concerns. But we believe there's enough to raise a reasonable inference that Roof's engagement on Facebook would have matched his engagement on the Internet more broadly. Other websites like Stormfront, you know, known sites like that. Facebook's algorithm is geared to keep you on that site. If that's what he's looking at off of Facebook, then when he gets on there, they want to keep him there. They don't want him going back to Google. We want to keep you on Facebook. We're going to show him as much content as... Can I ask you a really specific fact question? There's a reference to the Discover results. There's, like, Recommended for Me and then Discover. What is that? Can you, do you know? Can you tell me? I wonder if I could find it in the complaint. You say at paragraph 157, analysis by Facebook showed that 64% of all extremist group joins are due to our recommendation tools. This included Facebook's Groups You Should Join and Discover algorithms. And I don't know much about these platforms other than what you plead. I just wanted to make sure I knew what Discover algorithm was, what it's doing. I imagine, I'm not totally familiar with the Discover algorithm myself. This paragraph and what's detailed in there comes from studies and outside sources. The Discover algorithm, I presume, has to do with search function. I'm just trying to see if there's a line to be drawn between affirmative recommendations, what we might say is speech from the platform versus third-party content. Certainly. I think the more recent cases bear that out. I want to say Khalees first met a platform, or it might have been Rye versus YOLO. One of the recent Ninth Circuit cases made that distinction. I could be wrong about that. As you can see, I've got a large stack of cases and they kind of all run together when you're reading. But if it was Rye versus YOLO, that's right. Where the recommendation algorithm played no part and the product defect allegation that the court addressed and said was properly played was only concerned anonymity. They acknowledge that more broadly that their holding is not saying that product claims or design defect claims are never good. They specifically address this one and they decline to address the broader argument which would include what we're saying. But yes, Facebook's role in recommending and connecting and matchmaking as opposed to simply publishing would be the crux of the matter. If he searched independently and found materials that he was already looking for, that would be a different story. Can I ask you, you were about to talk about net choice and how net choice changed the landscape in your view. But I'm not sure that I agree with that, but I'm certainly amenable to being persuaded otherwise. So net choice was not a case about Section 230, but it was a case about whether or not the state, i.e. the government, could dictate to these social media platforms how they would curate the particular information that was being filtered through their feeds in the court. First of all, decided that the courts below had looked at the issue incorrectly. It should have been analyzed in terms of a facial challenge as opposed to an as applied challenge. But more importantly, they did say, and I'll concede this, that because social media platforms are engaged in expressive activity, that's a core First Amendment right, and state governments, in this case Florida and Texas, could not compel them or dictate to them how they would filter or curate the information, and that seems to me to be correct. But that doesn't at all, to my mind, suggest that Congress couldn't say, notwithstanding that they might be engaged in expressive activity, we're still not going to allow lawsuits based on the information that they gather from other folks and curate and send out via their algorithms to their users. So those don't seem to be inconsistent to me, but can you explain to me why you think they are? Well, I think Justice Thomas, in his multiple dissents where he's calling for. Well, it is a dissent. Correct. But, you know, a point that he draws is that you can't have your cake and eat it, too, essentially. They met another. Apparently Congress said they could. Our argument would be that, and I believe many of these courts, including Justice Thomas, agree that these are not textual readings of 230, that. Isn't that the premise of publisher liability? You're being held responsible for speech. And, you know, we have to take into consideration that choice. But it doesn't seem inconsistent to say that that choice is properly recognized. This is expression. But then in 230 casts a very wide net that protects these platforms, even when they're expressing something, but because they're putting together other third parties' expressions, even if it involves their own First Amendment rights. Well, I believe that's the change. In the 230 context, Meta has constantly argued in courts all over the country that this is not their content. This is not their speech. In the First Amendment context, you get a little bit of a different tune. But Section 230 on its face only prohibits treating them as the publisher or speaker of another's content, another Internet computer service, IC, whatever the term is. Why isn't that exactly, though, what's being done under your allegations? They're making decisions. They're algorithms as to what content to put in front of people. They're arranging information and putting it out there. Isn't that classically what a publisher does? It takes other parties' information and then decides how to market it, how to put it out there, where to place the emphasis? How is that different? Well, I would point to Judge Katzmann from the Second Circuit and his dissent, which I believe Henderson and the Supreme Court and Justice Thomas, a lot of other courts have been picking up on. His analogy was very good. If you had a friend or acquaintance who said, hey, I've read everything you've ever written, read everything you've ever posted on the Internet. I've also read everything that this other author has posted, and I think you two should meet. You might say your friend or acquaintance fancies himself a matchmaker, but would you call him a publisher? Have we ever known publishing in the traditional sense of the word to include such targeted direction of content? And that's where the Moody versus Net Choice decision comes in. It's now been proclaimed by the Supreme Court that that's their expressive content. That's not the expressive content of others. Now, to your point, and as I believe Henderson allows, we're not running from the content itself having impacted Roof. It certainly did. That's not what we're seeking to hold Meta liable for, for the content of a third party. We're seeking to hold Meta liable for their product design, the architecture of their system that would immerse someone like Dylann Roof in essentially an echo chamber of content that affirms his beliefs. Excuse me. I didn't mean to interrupt, but their decision to put certain information and certain content in front of certain people, that's what you're going after, right? And see, that's what I'm struggling with. How's that different from publishing? Well, I would point to, in addition to Anderson versus TikTok, the other supplemental authority we cited, and while it is a magistrate's report and recommendation in TV versus Grindr out of Florida, it is a very detailed and well-thought-out opinion that addresses, you know, for my part and what I've researched, pretty much all of the arguments and the evolution of the case law and how we've moved away from what the purpose of 230 was or what many believe it should have been, which is simply to ensure that Internet service providers, like they were back in the days of AOL when Zeron was decided, would not be held liable simply for hosting content that they had no part in. And I'm interrupting you again, but I think isn't the issue really who fixes this? I mean, this is Congress's law, and how do the courts go about fixing it? I mean, we have to take the words that were given and the reasonable construction of them and apply them in the arguably more modern context than the old printed word publishing business. But we're still, I don't want to say stuck, but we're still confined with the words that Congress gave us, and to me, the burden is on Congress to fix this, and the courts really can't fix it. And I think that a lot of the cases are expressing the frustration of the courts because it's a square peg in a round hole in reality. Maybe Congress never contemplated the reach of the Section 230 when they enacted it, but if there are going to be restrictions, don't they have to come from Congress? My favorite iteration of that more recently was a four-dimensional peg in a three-dimensional hole, which I think fits the technological times we're in. But respectfully, no, Your Honor. I don't believe that Section 230 includes in its text the breadth of how it's been interpreted and used, and I believe Justice Thomas agrees, as do many other courts, Judge Katzman in his dissent and in force, that we've gone far beyond the language and the intent of Congress, which is, as I was saying, to prevent, in order to allow this vibrant, you know, new platform of free expression, it was important that simply hosting third-party content wouldn't get you on the hook for whatever is harmful about it. But it says nothing about anything beyond that. The text says to hold you liable as the publisher or speaker of third-party content. When you are yourself expressing what, where content should be directed, where I believe will be most interesting to most users and using it in a way to garner more attention on your site, you've gone beyond traditional publishing and beyond the text of 230, certainly. All right, thank you, Mr. Mandich. Mr. Spencer? Thank you, Your Honor, and may it please the Court, Jacob Spencer on behalf of Appellee Meta Platforms, Inc. Dylan Roof's horrific murders at Mother Emanuel are an unspeakable tragedy. But the complaint's attempt to hold Meta liable for that tragedy is barred under Section 230 by Henderson, Zarin, and other cases of this Court. What the complaint says in paragraph 167, where it is describing the alleged radicalization of Dylan Roof, is that Dylan Roof did not spend that much time on Facebook and was not particularly active with posting. But that time he spent on Facebook allegedly served as an affirmation of beliefs that he had acquired elsewhere. That theory of liability flows directly through the dissemination of allegedly improper content and is therefore barred by Section 230 under Henderson, and it also fails to state a claim under South Carolina or federal law. Can you talk about the distinction that the Third Circuit made in the Henderson case between first-party speech and third-party speech? The panel there seemed to be persuaded that Congress, in Section 230, never contemplated immunity for first-party speech in the context of platforms that go beyond simply being a repository of information and make conscious decisions as to what will or will not be included in a particular curation of that information. Of course, Your Honor. I think the first thing I would say, as the Third Circuit itself recognized in Anderson, is that its decision is inconsistent with this Court's opinion in Zarin and with cases applying Zarin. So the Third Circuit departed from this Court's well-established precedent, which compels affirmance in this case. On that distinction, I think there are several problems with it. But the foremost one, to my mind, is everyone recognizes that Section 230 was enacted in part to overturn the Stratton-Oakmont against Prodigy decision, which had held Prodigy liable on a defamation theory. And the reason why Stratton-Oakmont held Prodigy liable was because Prodigy was not just a neutral passive conduit or bulletin board, but because Prodigy exercised what it called editorial control, and it held itself out as a different type of website and safe for families because it exercised editorial control. And it was exactly that editorial control and the way that it was implemented through automated or algorithmic content moderation that caused the Court to treat Prodigy as a publisher of the allegedly defamatory speech that was posted on Prodigy's website. So to say that when a provider like Facebook engages in publishing activity, which is what this Court has held consistent with the text purpose of Section 230 as protected by Section 230, to say that that very activity is what deprives it of Section 230 immunity turns Congress' goal in its head, and also is inconsistent with the plain text of Section 230. If you look at Section 230 F4, which is the definition of an access provider, which is defined to be an interactive computer service provider, an access provider does things like pick, choose, filter, organize, reorganize, display, and forward content. So if those activities, if those publishing activities are under Section F4, what makes you eligible for Section 230 immunity? It would be a very surprising result if those same activities were also what removed you from Section 230 activity because then it is your first party conduct. And I think that this Court's case in Henderson lays out the very careful framework that applies directly to this case. It seemed like the Third Circuit was also making a distinction, perhaps, between TikTok as a unique social media platform and perhaps others in the sense that in that case the 10-year-old child had her, and frankly I'm completely ignorant when it comes to TikTok and thankfully so, but she had her own page and a video was then promoted through that page. Is that, I guess what I'm asking, is TikTok any different from your client's sort of method of curating information and does that matter? I think, first, I would say it doesn't matter in this case because this Court in Henderson and Zarin applied a well-reasoned test for Section 230 that covers this case. But there is a distinction between the TikTok case and this one. That was about what the Court called a targeted recommendation. There's some discussion to concede in the complaint about some types of recommendations, but if you look at the actual allegations providing the speculative and minimal link between Meta's alleged conduct and Dylann Roof, that doesn't turn in any way on targeted recommendations. I wanted to ask you about that. I'm glad you mentioned it. Paragraph 89 of the complaint says that Roof was directed by Facebook based on its algorithms, knowledge of its engagement on the Internet, to groups and communities in which his views were cultivated, developed, made more extreme. What's your perspective on these allegations about recommendations to join certain groups? Your Honor, I think that is the allegation in the complaint that suggests not only that he was directed, but that he found groups, and it itself turns on the content where his views were cultivated, developed, and allegedly made more extreme. So even that turns on the content. I guess I'm wondering, is there a distinction? We have Zarin and Henderson that very clearly lay out what it means to be acting as a publisher, but do they go so far as to cover recommendations? So instead of just you're being held responsible for someone else's content, you put their content out there. But are these recommendations different? How does Facebook recommending that someone join an extremist group, how does that fall under our definition of publisher? I think, Your Honor, the court doesn't need to reach that question in this case because I don't think it's presented by the complaint, which is about white supremacist propaganda that Dylann Roof was allegedly radicalized by. The complaint says that at paragraph 5, at paragraph 6, at paragraph 7. And then at paragraph 62. Let's imagine that the question I just asked is relevant and that I think the complaint has allegations about recommendations to join groups. How do you think we should think about, how should we think about that in light of our precedent about publishing? Absolutely, Your Honor. As the Second Circuit held in Force and as the Ninth Circuit held in Dyroff, recommendations in the sense of where you display content, how you display content, making content more prominent in someone's feed, alerting readers to particular content, all of that falls within the traditional editorial functions that this court has time and again said are protected by Section 230 and not enough to take you outside the boundaries. Is there a difference? And again, we might be wading into waters about social media that I thankfully don't know much about. Is there a difference between where content is placed? It happens, the algorithm puts it on someone's news feed versus prefacing that with, we think you would like this group or groups you should consider where it's kind of an affirmative statement by the platform. Absolutely. I think in the language of Henderson, what you are looking at is whether the service provider made a material contribution to the unlawfulness of the content. So you can imagine a recommendation that is itself defamatory within the plain text. This video you should watch because something negative, something defamatory that's in the recommendation. And that, I think you would say, could constitute a material contribution to the unlawfulness of the content. Well, what about recommending groups? Well, Your Honor, I think as Force laid out very well, recommending groups means recommending particular third-party content. So in the words of Henderson, if the claim turns liability as premised on the dissemination of some improper third-party content, then that falls within publisher activity as this Court has defined it. I thought groups were a little bit more about connecting people with other people. Then you can see the other people's content, but it's also making connections among people who share certain ideas, isn't it? Your Honor, I think that's not quite precise. I think that groups are groups of third-party content. It's not recommending a person. It's recommending a person's third-party content. So even groups are about third-party content. But I think, again, if you look at paragraph 62 where the complaint specifies, it says that Roof radicalized online and Facebook was a factor in that process. The things it describes in paragraph 52 are, first, by allowing white supremacist groups essentially unrestricted access to spread hate. So that's not about recommending groups. That's about not taking third-party content down. It also says Facebook also led Russian intrusion by allowing numerous fraudulent campaigns on Facebook. So again, not about a recommendation. It's about not taking down. And if you look at paragraph 98, that's where the complaint describes what it calls the design defect in Facebook. And the design defect is, allegedly, that Facebook's goal was to maximize engagement. That is to publish, display content in such a way that people view that content. That's the traditional editorial function. And if you look at what they fault Facebook for, paragraph 195 says that Facebook had options to, quote, curb the spread of negative content. So again, about content. And paragraph 126, Facebook had options for moderating its algorithm's tendency to promote hate speech and misinformation. And in the paragraphs about how Roof was allegedly radicalized, what it ultimately says is that although Roof spent little time on Facebook, that time served as an affirmation of beliefs, which is necessarily about content. And I think that same reason why this falls within the heartland of traditional editorial discretion of a claim based on the dissemination of allegedly improper third-party content, so it's barred by section 230, is also the reason why this complaint fails to state a claim under South Carolina or federal law. And I would start with what was discussed in the previous argument, which is the lack of any but for approximate causal connection between Meta's alleged conduct, and specifically the design defect alleged, which is a goal of maximizing engagement with algorithms, and Dylan Roof's horrific murders. The complaint itself says, this is paragraph 60, paragraph 166, that Roof began the radicalization process through a Google search. And that Google search led him to a different website for a white supremacist group called the Council of Conservative Citizens. And it acknowledges that he spent limited time on Facebook and was not particularly engaged with posting. The only specific allegation about Roof and Facebook is that Roof himself changed his profile picture on Facebook a few months before the shooting. That's not enough. And then there's that paragraph 89 that I quoted to you, that Roof was directed by Facebook to groups or communities where his views were made more extreme. Yes, Your Honor. I think that there's no allegation about any particular content he saw, any particular groups he joined. And under the Nemet Chevrolet case, I think that those matter in assessing Section 230 and also the merits. How would they know all that before they get discovery? Your Honor, this is a somewhat unusual case. You're going to say because the criminal trial. It's both Roof's manifesto, which is cited in the complaint, and the criminal trial. And the manifesto... Is that the standard? I mean, imagine that stuff wasn't out there and this was a less well-known person who had caused some maybe lesser harm against someone. Plaintiffs wouldn't necessarily have access to all of their perpetrators' activities on Facebook, would they? And they have to make the best allegations they can, and our pleading standard acknowledges that. Certainly, Your Honor, and I think two responses there. One is that as this Court has held, you need a plausible allegation before you unlock the doors of discovery. So it's not enough to speculate and say, we need discovery to confirm. And then the second is, it's not that there's a lot of information out there, and therefore they don't need to know more. It's that the information from the manifesto and from the criminal trial, which is incorporated by reference into the complaint, undermines any plausible connection, causal connection, between any alleged conduct by Mehta and the horrific murders. And I think beyond the lack of but-for causation, there's also a lack of proximate causation. And I think the case that is just squarely on point here is the Sixth Circuit's Crosby against Twitter decision, where it's almost identical recommendations. A young man, Omar Mateen in that case, who allegedly self-radicalized by viewing ISIS content online. And based on that self-radicalization from the content that was allowed to be in his feed, that was promoted to him, that was not appropriately taken down, he committed the Pulse nightclub shooting. And the Sixth Circuit in that case said, there's no proximate causation here, in part because there's billions of people using social media. Was there an allegation there that the algorithms were causing radicalization, or just that material was available and not taken down? In a sense, the allegation was that the algorithm should have been changed to better identify and take down and remove these ISIS content. There wasn't an allegation that the algorithm itself is causing the harm by increasing the volume of negative content that's given to particular users. That theory was not in Prosby. Of course, it was in Force, where the court said that it was barred by Section 230. The court said in a footnote that it didn't consider the radicalization point in Force. What it didn't consider is the idea that they were designed to promote radicalization. Of course, the theory here, the defect, is not that it was designed to promote radicalization. The theory is that the actual defect in this case is that the goal is to maximize engagement with third-party conduct. Then the complaint then says, polarizing divisive conduct tends to be more engaging and therefore is displayed more prominently in the news feed. I don't think that's a recommendation within what courts have been talking about Section 230. I think that under Prosby and other cases, it certainly is not enough for proximate cause. I guess I would say, too, that if there's any sliver of this case that can evade Section 230, either because it's expressive activity or first-party speech, that's all the more reason, as the Sixth Circuit said in its James case, not to stretch the law of product liability to apply in that case. Here, we have this court's decision in Lorenz talking about how you interpret South Carolina's statutory rule, which is the restatement of second of torts, says that the court should be cautious in expansive interpretations of that statute to make sure that the law of product liability does not become untethered from its purpose, and its purpose is products that are capable of causing grievous bodily injury. The theory in this case is about thoughts and ideas and expression, and courts have held time and time again in James, the Ninth Circuit's decision in Winter, that that theory of liability is not a product theory, which is a reason to affirm all of the state law claims. In addition to the fact, and James goes through this in considerable detail, there's no allegation here that plaintiff was a user or consumer of any alleged product. Why does that element apply outside of strict products liability? I thought South Carolina could predict would be harmed. Your Honor, it's undisputed in this court that the user or consumer applies to all of the product theories because South Carolina has said that negligent design has all the same elements. No, they haven't said it. I mean, you say that in your brief, but that's kind of a paraphrase in an opinion that says, you know, these three elements also apply, and when you look back at the three they're talking about, it's not the user or consumer language, and South Carolina's been pretty clear that user or consumer doesn't include foreseeability analysis that is included in the negligence claim, and that's part of the restatement too. I think, Your Honor, even if you were to apply a foreseeability analysis as the Sixth Circuit concluded in Crosby where it applied a foreseeability analysis to nearly identical claims, it's not reasonably foreseeable that someone who in this case is alleged to have spent limited time on Facebook would go on to commit one of the most horrific racial murders in modern American history. That's well beyond any natural and probable consequence of anything that Facebook allegedly did. I say I'm over time. Thank you, Mr. Spencer. Are you receding your time? It would take you a minute to get up here, so you probably... Mr. Bledoe. We'll hear from you, sir. May it please the Court. Francois Bledoe for the plaintiff. Traditional editorial functions. That's what we're really here about. That's what the law's about. That law was passed in 1996. Zoran happened in the late 90s. At the time, no one imagined the world that we're in today in regard to Internet interaction and social community and those effects. My good friend, in his response to our appeal, noted or likened Facebook publishing as a newspaper that put up some image that was horrific in the paper. That's not what we're dealing with. Judge Rushing pointed this out. This company tracks everything you do online. It builds a profile on you. And then it sends material to you, both through its feed, news feed, what you see when you get on the site, and it directs you in a way to psychologically manipulate the biochemistry in your brain. I'm a surgeon as well as a lawyer. This is an area that I've spent a lot of time in. The issue is so far beyond any kind of traditional editorial function that the Communications Indecency Act, when it was passed, even thought of. They couldn't even imagine where we are today. When you go online... That's not an unreasonable argument, Mr. Blodeau, but, of course, Congress has had... They haven't been living in a cave. They've understood, I think, these policy arguments and have yet to take any action. So getting back to Judge Keenan's point, why are we in the best position to do that? Because... If you look at the progeny of cases, the initial thought process in Zoran, at the time, was appropriate. I think it was a proper type of legal analysis that was done. But since then, the blanket immunity that has been added, I think, has gone too far. And what this court is really about today is do we need to pull some of that back? If a company profiles someone and instead of just putting content out, actually has its own algorithm and its own product with a goal of pushing you into an echo chamber and there's no doubt that online radicalization occurred in Dylann Roop, there's no fuss about that. Fact. In their response, they say it's just other internet companies that did it. What we know about the trial is Dylann... Why isn't that publishing? I mean, it might be a very bad publishing practice, but you can imagine... I know analogies to print are dangerous, but imagine a magazine tracks every subscription you have and they discover that you like bad ideas and they want to send you a magazine full of bad ideas in articles that other people have written. They're publishing other people's bad ideas to you and that's still publishing, even if it's irresponsible publishing. Yeah, so display, alter, promote, monitor, delete content. Those are publishing. That's publishing. Trying to biochemically change your brain so that you spend more time on their site so that they can make money? That's their interest. That's their product. That's not the same thing. How do they do that? What's the allegation for how they cause someone to spend more time on the site? Isn't it by giving them certain content? It's by the psychological profile that they build, their algorithm that analyzes you and then feeds higher and higher and higher and higher levels of chalk to you to trigger your brain to want to continue. And so it is a... And look, the science is coming out on this. There's no question that this is going on. And the problem here in this case, the other thing I want to address, I don't have much time left, is this argument that, well, we don't think he spent that much time on Facebook. What we know from the criminal trial is that Dylann Roof was a loner. He was a true lone wolf. And at that time on Facebook and his posting photographs of him shortly before he acted, there's no question that his interaction with Facebook played a role in his determination that this was the truth. The sky was falling. African-Americans are committing all these crimes and doing all these things. There's no question that, to your point, Judge Rushing, that we're limited in our ability because we've had no discovery. There's no question. From Frances Hagan's papers, there's so much smoke here. Frances Hagan, when she released the documents that she released, showed that there was a hate algorithm, showed some internal things that we didn't have access to. For us, at this moment, based on all the facts that we know and based on the nine people that died that day in that church, we, as a public, are telling this court what Facebook did is not publishing within the intent of what publishing was. Mr. Zerron, if we were to agree with you, what would you tell us or how would you suggest that we address Zerron? What would you say? How would you suggest we deal with that opinion? I don't think Zerron's wrong on its face, but I think what we're dealing with today is different than what we were dealing with in 1997 when Zerron happened. At that time, Facebook did not have the ability to psychologically profile you. They didn't have the ability at that time to share information with Google. They didn't have the ability in that time to understand the biochemistry of the brain. The amount of information that is gathered on each one of us and how we're manipulated by this company is something that we need to know more about. And we cannot... Look, hate crimes are up in this country astronomically since 2014. This has got... Sorry, Judge. This has got to stop. And it's not going to stop until we take some of this blanket immunity off. Let us get to discovery, and then they can make their argument and some of their judgment. But this coming up here and arguing that because of a law in 1996 and a ruling in Zerron in 1997 gives them blanket immunity to do all the crazy stuff they're doing, that's wrong. And I agree, Judge DeGasse, that Congress ought to do something. But I don't know. I'm from Birmingham, Alabama, and I don't know of a more dysfunctional place than Washington, D.C. right now. So I'm putting it on you, Judge. Yeah, I think you need to act. I think Judge Keenan has a question. It seems to me that you're arguing that the intent of Facebook has a bearing on whether it is a publisher within the meaning of Section 230. You keep saying they intended to do this. Their goal was to maximize. And do you agree with me that your argument seems predicated on their intent? Absolutely. They want to make money, Judge. They're a corporation, one of the biggest corporations in the world, and they want to make money. And that's all they care about, and we have given them...  And I don't mean to interrupt you again, but I'm trying to think, how does this court write an opinion with your point of view? So you're saying that you have to establish a certain subjective intent, and then that creates lack of publication, or you're not a publisher if you have this in your mind, but you are a publisher if you do the exact same act, but you don't have that in your mind. You see what I'm saying? Yes. How difficult it is. Yes, I understand it. I would tell you that, sure, if we like ceramics and we're trying to learn about ceramics and we go and search on ceramics and we want the Internet provider to be able to give us some information on different ceramics and we want the search engine to work the right way, and, you know, we get that. That's not what we're talking about here. What we're talking about here and where the line gets drawn is as a company, as a social media company, if they go to the point of manipulating your brain purposefully only in order to make sure that you stay on the site, regardless of the psychological damage that they know can occur to you because they just want to make money, that's not protected publishing. That's avarice, greed, inhumane, incorrect, and this country and our public cannot tolerate this anymore. So that's my message today and I'm sorry for my forceful nature. The surgeon in me comes out a lot. So I appreciate the opportunity to talk. I'm glad to answer any other questions. Thank you very much, counsel. We appreciate your argument. We very much appreciate the arguments of the lawyers here this morning on this very interesting and difficult case. We'll come down and greet you and then move on to our second case.
judges: Albert Diaz, Allison J. Rushing, Barbara Milano Keenan